**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**CLARENCE DACE**,

**Plaintiff,**

**v.**

**RACHEL SMITH-VASQUEZ, et al.,**

**Defendants.**                                              **No. 06-cv-992-DRH**

<u>**ORDER**</u>

**HERNDON, Chief Judge:**

## I. <u>Introduction</u>

Before the Court is Defendant's Motion for Summary Judgment (Doc. 31).

Plaintiff timely filed a Response. (Doc. 37). Defendants timely filed a Reply. (Doc.

38). The Motion for Summary Judgment pertains to the Complaint's remaining

Counts, which are Counts 1, 8, and 9.[1] The Court held a hearing on the merits ("the

hearing") on August 3, 2009 and took the matter under advisement. (Doc. 49).

Plaintiff filed this matter pursuant to 42 U.S.C. § 1983. In Count 1, Plaintiff

asserts a deprivation of his Eighth Amendment rights through exposure to

excessively cold conditions during his incarceration at Menard Correctional Center

in December 2004. (Docs. 1 and 9). In Count 8, Plaintiff claims that Defendants

unconstitutionally retaliated against him by (a) exposing him to excessive cold

_____

[1]Pursuant to authority granted in 28 U.S.C. § 1915(a), the Court dismissed, with prejudice, Counts 2,3, 4, 6 and 7 of the Complaint. (Doc. 9). For the reasons stated below, the Court, *sua sponte*, dismisses Count 5 as well.

conditions in December 2004; (b) refusing to allow him commissary privileges to which he was entitled; (c) damaging certain items of his personal property; and (d) refusing to process his grievances. The retaliation was allegedly for his filing of grievances and because of a lawsuit he filed against officials at Menard Correctional Center in 1998. (Docs. 1 and 9). In Count 9, Plaintiff alleges that Defendants engaged in a conspiracy to retaliate against him for the lawsuit and grievances referred to in Count 8 by (a) exposing him to excessive cold conditions in December 2004; (b) refusing to allow him commissary privileges to which he was entitled; (c) damaging certain items of his personal property; (d) physically abusing him; and (e) refusing to process his grievances. For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## II.  Dismissal of Count 5 and Certain Defendants Pursuant to Federal Rule of Civil Procedure 4(m)

Before proceeding to the merits of the Defendants' Motion for Summary Judgment, the Court must take up the issue of Plaintiff's failure to serve certain defendants. Count 5[2] of the Complaint, which survived the Court's initial screening process pursuant to 28 U.S.C. § 1915(a), was a claim of excessive force against a person identified only as "Officer Maue." Despite two attempts by the Federal Marshals (Docs. 11 and 14), "Officer Maue" was never served with the waiver of

---

[2]The Court's reference to "Count 5" does not correspond to the "Count V" designated in Plaintiff's Complaint. As the Court set forth in its Order of May 2, 2007 (Doc. 9), the Court broke down Plaintiff's claims into numbered counts in accordance with the objectives of Federal Rules of Civil Procedure 8(f) and 10(b). Thus, Count 5 actually refers to the conduct alleged in Count VII of the Complaint.

service forms or the Complaint nor did he or she waive service. On the same two attempts at service, two other persons Plaintiff identified as Officer White and Officer Cowan, who are both named in Count 9, were not served with the waiver of service forms or the Complaint. Neither of those persons waived service. Finally, Plaintiff identified one defendant as only "John Doe."

Plaintiff failed to request any further action to attempt service of the Complaint after the second set of waiver of service forms for Officers Maue, Cowan and White was returned un-executed on May 21, 2007. Defendants' counsel notified Plaintiff at his deposition on August 1, 2008 that some of the persons named as defendants in the Complaint had not been served. (Doc. 31-2, p. 38). Plaintiff failed to request any further action regarding service following that notification. The Court notes that Defendants' counsel stated at the hearing held August 3, 2009 that Defendant "Maue" and "Cowan"were never served with the Complaint. Plaintiff made no response to that assertion and has not since requested any action be taken to serve Maue and Cowan. Plaintiff also failed to ever provide the Court or the Marshals with the actual identity of "John Doe" despite receiving notice that such identification was necessary if that person was to be served. (Doc. 9).

Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." **FED. R. CIV. P. 4(m)**. While the rule generally requires notice before an action is dismissed pursuant to Rule 4(m), the

purpose of such notice is to give the plaintiff an opportunity to show good cause for the failure.

In the case at bar, the Court finds that Plaintiff cannot show good cause and that he had actual notice of his failure to serve Defendants. Plaintiff knew or should have known in May 2007 that the Marshall twice attempted service on Maue, Cowan, and White but failed because of inadequate identification. Plaintiff then was directly notified by counsel for Defendants in August 2008 and August 2009 that he had not served some of the persons named in his Complaint. In both cases, Plaintiff failed to take any action or request any assistance to ensure service of process. Plaintiff also failed to identify the person identified as "John Doe." Under those circumstances, Plaintiff cannot show good cause and notice pursuant to Rule 4(m) would serve no useful purpose. Accordingly, the Court **DISMISSES, WITHOUT PREJUDICE**, Count 5 of the Complaint and those persons identified as "John Doe," "Officer Maue," "Officer Cowan," and "Officer White."

### III.  <u>Failure to Exhaust Administrative Remedies</u>

At issue in this case are a series of grievances, which Plaintiff claims one or more Defendants thwarted him from exhausting. Defendant Reardon served as a counselor at Menard Correctional Center during the relevant time period, as did Defendant Summers. (Doc. 31-2, pp. 19 & 23). The first set of grievances at issue, which Plaintiff submitted to Defendant Reardon, are as follows: (1) December 14, 2009 for cold conditions; (2)December 28, 2004 alleging "Officer White" hit Plaintiff

in the stomach with a juice carton; (3) February 9, 2005 for being denied commissary on February 5, 2005; and (4) April 25, 2005 for an alleged assault by an unidentified officer. (Doc. 37-2, pp. 13-19). The second set, which Plaintiff avers he submitted to Defendant Summers , are as follows: (1) June 3, 2005 for (a) damage to Plaintiff's personal property; (b) the alleged assault in April; and (c) an alleged assault by "Officer Maue" in May 2005; and (2) July 2, 2005 for (a) counselor Reardon's refusal to respond to Plaintiff's grievances to him; and (b) the denial of commissary privileges by "Officer Cowan" and Defendant Waller in May 2005. (Doc. 37-2, pp. 13-19).

Plaintiff's status as an inmate subjects his claims to the provisions of the Prisoner Litigation Reform Act ("PLRA"). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such *administrative remedies as are available are exhausted*." **42 U.S.C. § 1997e(a) (emphasis added).** The burden of proof on the issue of exhaustion lies with Defendants. ***Westefer v. Snyder,* 422 F.3d 570, 577 (7th Cir 2005).** The Seventh Circuit, however, requires strict adherence to the PLRA's exhaustion requirement. ***Doe v. Chandler,* 438 F.3d 804, 809 (7th Cir. 2006) (noting "[t]his circuit has taken a strict compliance approach to exhaustion.").** In addition, exhaustion must occur before the suit is filed. ***Ford v. Johnson,* 362 F.3d 395, 398 (7th Cir. 2004).** "Plaintiff cannot file suit and then exhaust his administrative remedies while

the suit is pending." *Id.* Finally, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require.". ***Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2005).***

As an inmate confined by the Illinois Department of Corrections, Plaintiff was required to follow the regulations contained in the Illinois Department of Correction's Grievance Procedures For Offenders ("grievance procedures") to properly exhaust his claims. **20 Ill. Administrative Code §504.800** *et seq.* The grievance procedures first require inmates to speak with their counselor about their complaint. **20 Illinois Administrative Code § 504.810(a).** If the inmate feels the counselor does not resolve the issue, the inmate must file a grievance form directed to the Grievance Officer within 60 days of the incident. *Id.* The grievance form must:

> contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is subject of or who is otherwise involved in the complaint. The provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

**20 Illinois Administrative Code 504.810(a)(b)**. "The Grievance Officer shall [then] consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer . . . [who] shall advise the offender of the decision in writing within 2 months after receipt of the written grievance, where reasonably feasible under the circumstances." **20 Ill. Administrative Code §504.830(d)**. The Chief Administrative Officer is the highest ranking official at the corrections facility. **20 Ill. Administrative Code §504.802**.

If the inmate is not satisfied with the Chief Administrative Officer's response, he or she can file an appeal with the Director through the Administrative Review Board ("ARB"). The grievance procedures specifically state, "[i]f after receiving the response of the Chief Administrative Officer, the offender still feels that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision. Copies of the Grievance Officer's report and the Chief Administrative Officer's decision should be attached." **20 Ill. Administrative Code §504.850(a)**. "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." **20 Ill. Administrative Code §504.850(e)**. "The director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." **20 Ill. Administrative Code §504.850(e)(f)**.

An inmate may request a grievance be handled as an emergency by forwarding the grievance directly to the Chief Administrative Officer. **20 Ill. Administrative Code §504.840.** The Chief Administrative Officer must evaluate the grievance to determine if there is a substantial risk of imminent personal injury or other serious or irreparable harm and respond to the grievance indicating what action will be taken. **20 Ill. Administrative Code §504.840.**

Defendants maintain that Plaintiff did not exhaust the administrative grievance process regarding the grievances at issue prior to bringing suit. Defendants point out that even if Defendants Reardon and Summers failed to directly respond to some or all of Plaintiff's grievances, the fact remains that Plaintiff failed to take up those unresolved grievances with the Grievance Officer as required by the regulation. The Court agrees.

Plaintiff argued at the hearing that he could not take the grievances to the Grievance Officer until Counselors Reardon and Summers responded. Plaintiff points to another grievance he filed in 2008 which he submitted to the Grievance Officer. (Doc. 37-2, p. 19). That grievance reflects that the Grievance Officer returned based on the following pre-printed answer on the form: "Issue needs to be discussed with your counselor for possible solution / need to have counselor provide a response." (Doc. 37-2, p. 19). The Court finds Plaintiff's citation to this form unavailing. That form is dated August 8, 2008, which is years after the events relevant to the case at bar. The fact that this Grievance Officer returned this particular grievance in 2008 has no bearing on the events in 2004-2005. Moreover, it is not clear from the face of the 2008 grievance that Plaintiff discussed the issue with his counselor at all, which would be a legitimate reason under the Administrative Code to reject his written grievance.

Nowhere in the record is there evidence that Plaintiff ever pursued the prescribed process for the grievances at issue as mandated by the Administrative Code. There are no records of him ever taking any of the grievances at issue in the

case to a Grievance Officer. Rather, it reflects that for a few of the grievances he attempted to skip over the Grievance Officer and proceed directly to the Administrative Review Board. (Doc. 37-2, p. 18). There is also no record that Plaintiff ever sent a grievance to the Chief Administrative Officer at Menard, who could have treated his grievances, such as the cold conditions, as an emergency and responded accordingly. Thus, the Court finds that Plaintiff failed to exhaust the Administrative Grievance Process for the grievances at issue in this case, including those concerning the unserved/unnamed Defendants discussed above.[3] However, even if that is not the case, Plaintiff's claims still fail because the record reflects that Defendants are entitled to summary judgment.[4]

### III. <u>Summary Judgment Standard</u>

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** ***Oats v. Discovery***

---

[3] The Court notes that the 2008 form response Plaintiff attached to his Response (Doc. 37-2, p. 7) is not entirely consistent with the Illinois Administrative Code. It is one thing to state that a prisoner must attempt to resolve an issue with a counselor, but quite another to state that he must receive a response before he can take the issue to the Grievance Officer. The Administrative Code makes no such provision but instead only provides that "if the offender is unable to resolve the complaint informally, . . . the offender may file a written grievance . . ." 20 IL-ADC § 504.810(a). Thus, by the plain language of the code, an inmate is not required to receive a written response or any response at all from a counselor before proceeding to the Grievance Officer. All that is required is that he attempt to resolve the complaint informally with the counselor. In cases where the Counselor does not respond to a grievance, which from the facts before the Court appears to have occurred in the case at bar, an inmate could be thwarted from pursuing the grievance process if the form Plaintiff cites is followed to the letter.

[4] Although a failure to exhaust administrative procedures would typically conclude any inquiry into the case, given the procedural posture of the case the Court finds that Defendants' Motion for Summary Judgment should be considered.

***Zone***, **116 F.3d 1161, 1165 (7th Cir. 1997) (citing** ***Celotex Corp. v. Catrett***, **477 U.S. 317, 322 (1986))**.  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law.  ***Santaella v. Metro. Life Ins. Co.***, **123 F.3d 456, 461 (7th Cir. 1997) (citing** ***Celotex***, **477 U.S. at 323)**.  In reviewing a summary judgment motion, this Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial.  ***Celex Group, Inc. v. Executive Gallery, Inc.***, **877 F. Supp. 1114, 1124 (N.D. Ill. 1995)**.  This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant.  ***Regensburger v. China Adoption Consultants, Ltd.***, **138 F.3d 1201, 1205 (7th Cir. 1998) (citing** ***Anderson v. Liberty Lobby, Inc.***, **477 U.S. 242, 255 (1986))**.  Summary judgment is appropriate if a party fails to make a showing of an essential element of his claim.  ***Celotex Corp. v. Catrett***, **477 U.S. 317, 322 (1986)**.

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial.  ***Walker v. Shansky***, **28 F.3d 666, 670-71 (7th Cir. 1994),** ***aff'd***, **51 F.3d 276 (citing** ***Celotex***, **477 U.S. at 324)**.  No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  ***Anderson***, **477 U.S. at 249-50**

(citations omitted); *accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). Summary judgment is proper if a party to fails to make a showing supporting the existence of an essential element of his claim.

## IV. <u>Analysis</u>

### A. Count 1: Eighth Amendment Violation: Excessively Cold Conditions

In Count I, Plaintiff claims that in December 2004 Defendants Smith-Vasquez, Waller, McDaniel, Reardon, and Spiller deliberately subjected him and other inmates in the North-1 Protective Custody Unit at Menard Correctional Center to excessively cold conditions. Prison officials are obliged by the Eighth Amendment to provide humane conditions of confinement. **U.S. CONST. amend. VIII**; *Farmer v. Brennan,* **511 U.S. 825, 832-33, 114 S.Ct. 1970, 128 L.E.2d 811 (1994))**. Prisoners are entitled to adequate shelter, which includes protection from "extreme cold." *Murphy v. Walker,* **51 F.3d 714, 721 (7th Cir. 1995)**; *Dixon v. Godinez,* **114 F.3d 640, 642 (7th Cir. 1997)**. That said, prisoners do not have a constitutional right to live in comfort. *Id.*

In a conditions of confinement case, an Eighth Amendment violation occurs only where the harm imposed by the conditions of confinement objectively was "sufficiently serious" to deprive the prisoner of "the minimal civilized measure of life's necessities." *Farmer v. Brennan,* **511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.E.2d 811 (1994))**. To assess whether cold cell temperatures are "sufficiently

serious," courts in the 7th Circuit consider (1) the severity of the cold; (2) its duration; (3) whether the prisoner has alternative means to protect himself from the cold; (4) the adequacy of such alternatives; and (5) whether the prisoner must endure other uncomfortable conditions in addition to the cold. ***Dixon,*** **114 F.3d at 644**. Just because low temperatures force a prisoner to bundle up during the winter does not mean that the prison's conditions' violate the Eighth Amendment. ***Id***.

In addition to the objective "sufficiently serious" condition, it must be shown, subjectively, that the prison official(s) acted with "deliberate indifference" to the prisoner's health or safety. ***Farmer,*** **511 U.S. at 834;** ***Del Raine v. Williford***, **32 F.3d 1024, 1032 (7th Cir. 1994)**. "Deliberate indifference" means that the prison officials "each knew that [the prisoner] faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." ***Townsend v. Fuchs,*** **522 F.3d 765, 773 (7th Cir. 2008)**. A prison official that takes reasonable steps to prevent harm to a prisoner cannot be held liable for subsequent injuries, even if the harm is not averted. ***Bagola v. Kindt***, **131 F.3d 632, 646 (7th Cir. 1997)**. "Deliberate indifference" means something more than mere negligence, but something less than intentional conduct. ***Del Raine,*** **32 F.3d at 1031-1032**. A prison official that does not know about the harm or cannot do anything about it, is not "deliberately indifferent" for failing to act. ***Del Raine,*** **32 F.3d at 1038**. Moreover, if the harm is remote and not immediate, then the suit

fails.  *Id*.

In his affidavit, (Doc. 37-2, pp. 13-19), Plaintiff states that from December 8, 2004 until December 29, 2004, when he was placed in segregation, the heat "stop[ped] working" in the North-1 Protective Custody Unit.  (Doc. 37-2, 13-15). Plaintiff also avers that directly across the hall from his cell was a door leading from the Protective Custody Unit to the yard outside.  (Doc.  37-2, p. 13).  According to Plaintiff's affidavit, that door allowed cold air to come indoors because of gaps around the bottom, top, and sides of the door.  (Doc. 37-2, p. 13). Within a "couple of days," he avers that it became "excessively cold" in his cell.  (Doc. 37-2, p. 13). Specifically, his affidavit reflects that he was "so cold" in his cell that wearing his clothing and coat did not "warm Plaintiff enough."  (Doc. 37-2, p.14).  Plaintiff further states that as a result of the cold temperatures, he contracted a common cold, but that he went to sick call.  (Doc. 37-2, p. 14).  At the hearing, he acknowledged that on sick call he received treatment for his cold.

Plaintiff also filed affidavits from fellow prisoners supporting his claim of cold conditions in the North-1 Unit at Menard in December 2004.  (Doc.  37-2, pp. 8-12.) Edward Hanks, avers that it was cold enough in his cell in December that he "had to wear winter clothing."  (Doc. 37-2, p. 12).  Dean Davis states that in December 2004 "it was so cold in my cell that I had to wear winter clothing and I was still too cold." (Doc. 37-2, p. 10.)  David Williams avers that in December 2004 "I was so cold that I had to wear long johns and my sweat suit on top of them, plus my socks, skull

cap, [and] gloves while inside my cell. I also had to sleep in all those items in order to stay warm." (Doc. 37-2, p.8). Williams also states that "[i]t was so cold, it was as if I was outside; even the staff wore their coats and gloves while working on #2 and # 4 gallery." (Doc. 37-2, p. 8).

Plaintiff states that he complained several times between December 8, 2004 and December 28, 2004 to Defendants Smith-Valquez, Waller, and McDaniel, regarding the conditions. (Doc. 37-2, pp. 13-15). He also states that on December 14, 2004 he mailed a grievance to Defendant Reardon (the prisoner counselor serving the Protective Custody Unit) regarding the cold conditions, but received no response. (Doc. 31-2, p. 42 ; Doc. 37-2, p. 14). Plaintiff states that on December 15, 2004 he mailed a grievance letter to Defendant Spiller (a Major acting as Public Service Administrator at the time) regarding the cold, but again received no response. (Doc. 31-2, p. 42; Doc. 37-2, p. 14). That said, in his deposition, Plaintiff testified that Defendants Smith-Vasquez, Waller, and McDaniel referred his complaints about the heating system to maintenance. (Doc. 31-2, p. 40-41). In his affidavit Plaintiff also admits that on December 14, 2004, he observed maintenance personnel doing some sort of work on the heating system. (Doc. 37-2, p. 14). Finally, in his affidavit, Plaintiff avers that he complained to a prison official of the excessive coldness on December 28, 2009 and the next day was moved to a cell in segregation. (Doc. 37-2, p. 15). In his deposition, Plaintiff testified that the segregation cell was heated. (Doc. 31-2, p. 45).

Defendants acknowledge that there was a problem with one circulation fan for one of the two heaters in the North -1 cell block,(Doc. 38-2), but deny that the heating system was ever shut down or inoperable. (Doc. 31-2, pp. 12-15; 20-22; 30-37; Doc 38-2). Defendants also assert that over 30 hours of maintenance was performed on the heating system for the North-1 housing units from October 2004-January 2005 (Doc. 31-2, pp. 30-37). Specifically, Defendant McDaniel submitted a work order on December 2, 2004, which was completed on December 30, 2004. (Doc. 31-2, pp. 13-14). Defendant Smith-Vasquez submitted a work order on December 14, 2004 and that work order was completed on December 20, 2004. (Doc. 31-2, p. 20-21). Both work orders were authorized by Defendant Waller.

Defendants also submit an affidavit by the Acting Stationary Engineer Chief at Menard, which reflects that even if one of the two heaters on the North-1 Protective Custody Unit was not functioning properly, each unit heater has an independent blower that would provide heat for the gallery. (Docs. 38 & 39-2). Further, Menard's centralized boilerhouse produces steam for each individual gallery, including those in the North-1 Protective Custody Uni, and would also heat the gallery. (Docs. 38 & 39-2). Finally, Defendant's point out that Plaintiff testified in his deposition that he was provided with cold weather clothing and bedding during the period of time the heating system experienced problems (Doc. 31-2, pp. 44-45).

At the hearing, Plaintiff countered that Defendants should have treated the heating problem as an emergency and more quickly addressed it. He also argued

that additional heaters should have been provided, but were not. Defendants do not contest Plaintiff's argument that no additional heaters were provided from December 8, 2008 until December 28, 2008. Defendants also admit that if the heaters were not operational in wintry conditions, an emergency would have been declared and additional blankets, winter clothing and heaters supplied. (Doc. 31-2, p. 22). However, there is no evidence in the record that any of the Defendants named in Count 1 had any power to declare the situation an "emergency." Plaintiff's only response at the hearing regarding that subject was that the "Warden" could have declared the emergency. In this, Plaintiff is correct: the Warden is the Chief Administrative Officer and upon receipt of an emergency grievance could have declared the heating situation an emergency. However, the warden is not a Defendant in this lawsuit and there is no evidence that Plaintiff followed the emergency grievance procedure by submitting a written grievance directly to the Warden during the relevant time period. Deon Davis, another inmate, avers that he submitted a grievance to the Warden regarding the cold and that it was treated as an emergency. (Doc. 37-2, p. 10). He does not elaborate on what measures were taken.

At the hearing, Plaintiff conceded that he had no evidence to support his allegation that one or more of the Defendants deliberately shut off the heat in all or part of the North-1 Protective Custody Unit in December 2004. Plaintiff also conceded at the hearing (and in his deposition) that Defendants Smith Vasquez, Waller and McDaniel referred his complaints about the lack of adequate heat to the maintenance department and that he had cold-weather clothing and a blanket during

the time in question. Plaintiff admitted at the hearing and in his deposition that just days after his initial complaints regarding the lack of heat, maintenance workers performed service on the heating unit. Nonetheless, he stated that those measures were insufficient to keep him adequately warm and that Defendants did not timely act.

Although he avers that the heating system was "not working," Plaintiff fails to offer any specific evidence to counter Defendant's affidavits that the heating units were never inoperable during the winter of 2004, that the only problem was one temporarily malfunctioning circulation fan in one of the two heaters, and that alternative sources of heat continued to provide heat to Plaintiff's gallery. That said, the Defendant Smith Vasquez's work order submitted December 14, 2009 states that "the heater does not work on 2 gallery." (Doc. 31-2, p. 37). That work order was resolved December 20, 2004 according to Affiant Steve Wallace, the Acting Stationary Engineer Chief at Menard. (Doc. 31-2, pp. 30). Defendant McDaniel's work order submitted December 2, 2004, which states "repair heaters on 2 gallery," was not resolved until December 30, 2004. (Doc. 31-2, p. 30 & 33). However, neither Smith Vasquez or McDaniel had any qualifications or expertise to service the heating systems, (Doc. 31-2, pp. 12 & 20), which negates inferences favorable to Plaintiff's case that could be drawn from their brief descriptions of the heating system problems. The record does not demonstrate that Plaintiff is qualified or authorized to work on the heaters. (Doc. 31-2, pp. 12 & 20), or that he had any access to the

heating system to make a knowledgeable judgment regarding its operating status. Beyond Plaintiff's claims of cold conditions and his observations of staff performing work on the system, the Court is left to guess how exactly Plaintiff reached the conclusion that the heating system was completely shut down.

The only evidence in the record regarding the weather conditions from December 8, 2004 through December 28, 2004 is Plaintiff's assertion in his affidavit that on December 22, 2008, the outside temperature fell below 20 degrees.[5] (Doc. 37-2, p. 14)[6]. Neither party offers any evidence of the actual temperatures in Plaintiff's cell or anywhere else in the North-1 housing unit in December 2004. Nor is there any evidence providing objective markers, such as freezing water, that might assist a determination of the temperature. At the hearing and in his affidavit, Plaintiff simply stated that it was "excessively cold" and that he was not warm enough, even with the winter clothing and blanket provided to him. Affiant Williams also avers that it was so cold in his cell that "it was as if I was outside." However, Williams offers no testimony on the duration of that level of cold, nor does he provide a date or dates on which he felt the temperature in his cell was "as if" he was outside or how he determined the temperature outside to make a comparison.

Defendants neither deny or admit that it was cold in the North-1 Unit in December 2004. The closest they come is in Defendant Spiller's affidavit which

---

[5]The Court presumes Plaintiff is referring to the Fahrenheit scale.

[6]The Court confirmed Plaintiff's statement by reference to public records. The low temperature on December 22, 2004 in the area of Menard Correctional Center was 15 degrees Fahrenheit.

states that he has "no recollection or knowledge" of the temperature in the North-1 unit ever falling below 65 degrees.[7] (Doc. 31-2, p. 22). However, the record reflects that other than discomfort and perhaps a common cold, Plaintiff did not incur any ill effects from the cold. The record also reflects that Plaintiff went on sick call and was treated for his common cold.

The Court finds that Plaintiff fails to support two essential elements of his claim. First, he fails to show sufficient evidence that he was exposed to a "substantial risk of serious harm," i.e., that the cold in Plaintiff's cell was "sufficiently serious" to deprive him of "the minimal civilized measure of life's necessities." Second, he fails to produce adequate evidence that the Defendants were "deliberately indifferent" to his situation.

Regarding the "substantial risk of serious harm," Plaintiff's evidence merely demonstrates that for approximately three weeks in December 2004 he and other inmates in his cell block subjectively felt the temperature was "excessively cold," that they had to bundle up to try to stay warm, and that he contracted a case of the common cold. There is no concrete, objectively verifiable evidence in the record that demonstrates the degree of cold in Plaintiff's cell during that time period. The record on the weather conditions outdoors is similarly scant. Nor do any of the prisoner affidavits add anything to the record regarding indoor temperatures beyond additional subjective claims that it was "excessively cold." Plaintiff avers that the

---

[7]The Court presumes Defendants are referring to the Fahrenheit scale.

measures Defendants took to protect him from the cold were insufficient for him to feel adequately warm, but the lack of objective data on the actual temperatures in his cell undermines the meaningfulness of those claims.  There is no evidence in the record that Plaintiff had to endure uncomfortable conditions other than the cold.

Such a record is insufficient to show that there was a "substantial risk of serious harm."  The fact that Plaintiff and the other inmates submitting affidavits bundled up and endured the claimed "excessively cold" temperatures for three weeks without any serious effects, belies that the temperature was cold enough to subject Plaintiff to a "substantial risk of serious harm."   It also undermines any inference that the risk of harm was "immediate" rather than remote.  The record certainly does not compare to that in similar cases analyzed by the 7th Circuit.  ***See, e.g., Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) (temperatures in cell averaging 40 degrees Fahrenheit and regularly falling below freezing for four consecutive winters); *Murphy v. Walker*, 51 F.3d 714, 720-721 (7th Cir. 1995) (allegation of unheated cell and no blankets or clothing for a 1 ½ weeks);  *Del Raine v. Williford*, 32 F.3d 1024, 1036 (prisoner housed in cell with broken windows in which temperature was near outdoor temperature including a period of two days where wind chills were from -40 to -50 degrees Fahrenheit); *also see Henderson v. DeRobertis*, 940 F.2d 1055, 1056-1061 (7th Circuit. 1991) (finding an Eighth Amendment violation clearly established where conditions included broken cell windows, below freezing temperatures inside the cell, no winter clothing, lack**

**of extra blankets, and a malfunctioning heating system over period of four days in which temperature fell to -22 degrees Fahrenheit and a windchill of -80 degrees Fahrenheit outside)**.  Thus, the Court finds that Plaintiff fails to show that Defendants subjected him to a "substantial risk of serious harm."

Even if there was a substantial risk of serious harm, the record affirmatively shows that the Defendants were not "indifferent" to Plaintiff's claims, let alone "deliberately indifferent."  Plaintiff testified both in his deposition and at the hearing that he had winter clothing and a blanket and that he used them.  The record reflects and Plaintiff conceded that the Defendants Smith Vasquez, McDaniel, and Waller made efforts to address his complaints regarding the situation by submitting work orders for the heating system.   In fact, Officer McDaniel submitted a work order for the heating system on December 2, 2008, six days before the relevant time period.  Pursuant to those requests, work was performed.  There is no evidence to indicate that Defendants Smith Vasquez, McDaniel, and Waller had the authority to do anything else.  Thus, given the specific evidence that the heating system was still operating, albeit without one of its circulation fans, the Court finds those measures reasonable as a matter of law.

That Defendant Reardon (a counselor) and Defendant Spiller (a Public Service Administrator) did not directly respond to Plaintiff's complaints regarding the cold is not evidence they did nothing at all or were "deliberately indifferent," especially given that by the time Plaintiff mailed those complaints, the heating problem was

already being addressed.  There is no evidence that any of these Defendants had the power to treat Plaintiff's complaints as an emergency and the Administrative Code indicates that is a power reserved for the Chief Administrative Officer.   There is no evidence that Plaintiff submitted an emergency grievance to the Chief Administrative Officer.

The record in this case certainly does not approach that in similar cases addressed by the 7th Circuit.  ***See, e.g., Dixon v.Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) (defendants only response to complaints of cold over four consecutive winters were sarcastic, callous remarks); *Murphy v. Walker*, 51 F.3d 714, 720-721 (7th Cir. 1995) (defendants intentionally confined prisoner in unheated cell with no blankets or clothing for  1 ½ weeks);  *Del Raine v. Williford*, 32 F.3d 1024, 1036 (prisoner officials failed to take any action to repair broken windows despite numerous requests and temperature inside cell approaching that outside in winter); *Henderson v. DeRobertis*, 940 F.2d 1055, 1056-1061 (7th Circuit. 1991) (defendants knew of sub-freezing temperatures in cell block but failed to provide winter clothing, extra blankets, or take any other remedial measures beyond continuing work on the completely inoperable heating system)**.  At best, the record shows that the Defendants might have been negligent, but that falls short of "deliberate indifference."  Thus, the Court finds that Plaintiff fails to present evidence tending to show that Defendants were "deliberately indifferent."

**B.** **Count 8: Retaliation**

In Count 8, Plaintiff claimed that Defendants Smith-Vasquez, Waller, McDaniel, Spiller, Martin, Reardon, Harris, Vasqez, Hoffman, Summers, and Martin retaliated against him for his 1998 lawsuit, (*Dace v. Page*, 98-cv-702, S.D. IL.), against various officials at Menard and for filing grievances. Specifically, Plaintiff alleges that Defendants retaliated by (1) exposing him to cold conditions; (2) denying him access to the commissary; (3) damaging personal property; and (4) refusing to respond to grievances. The only defendant in the case at bar that was a party to the 1998 lawsuit is Defendant Hoffman, who was dismissed from the 1998 case on August 22, 2000 by Order of this Court. The 1998 lawsuit was dismissed, without prejudice, by a stipulation of the parties on August 28, 2002.

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." **DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000)**. "Otherwise permissible actions by prison officials can become impermissible if done for retaliatory reasons." **Zimmerman v. Tribble, 226 F.3d 568, 573 (7th Cir. 2000)**. In order to prevail on a retaliation claim, a plaintiff must demonstrate that a defendant retaliated against him for engaging in constitutionally protected conduct. **Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996)**. In other words, the plaintiff must prove that his conduct was a "motivating factor" in the state official's decision to retaliation against him. **Hasan v. United States Dept. Of Labor, 400 F.3d 1001, 1006 (7th Cir. 2005)**. A "motivating factor" in this context "is a factor

that weighs in [on] the defendant's decision to take the action complained of-in other words, it is a consideration present to his mind that favors, that pushes him toward action." *Id*.

The burden to show that the protected conduct was the motivating factor for the retaliation is "high." ***Babcock*, 102 F.3d at 275**. To demonstrate the requisite causal connection in a retaliation claim, the plaintiff must show that the adverse action and the protected activity are not wholly unrelated. ***Hunt-Golliday v. Metropolitan Water*, 104 F.3d 1004, 1014 (7th Cir. 1997)**. Speculation based on suspicious timing alone does not support a reasonable inference of retaliation; instead, plaintiffs must produce evidence that somehow tie the adverse decision to the plaintiff's protected actions. ***Stagman v. Ryan*, 176 F.3d 986, 1001 (7th Cir. 1999)**. The fact that one even preceded another does nothing to prove the first event caused the second. ***Bemudez v. TRZ Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998)**. The amount of proof needed to show a causal connection between the protected conduct and the adverse action increases with the amount of time between the two events because the inference of causation weakens with time. ***Oest v. Illinois Dep't. Of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001)**. Moreover, "[i]f the same action would have occurred regardless of the retaliatory motive, the claim fails." ***Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004)**.

Prisoners have a constitutional right to access to the courts. ***DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000)**. This right encompasses the right to

pursue administrative remedies, the exhaustion of which is a prerequisite to filing suit. **Id.** Prison officials, therefore, may not retaliate against a prisoner for filing a grievance or a lawsuit. **Id.**

In his Affidavit, Plaintiff states that on August 20, 2004, Defendant Smith-Vasquez told him that "a lot of the staff dislike you because of a lawsuit you filed against Menard." (Doc. 37-2, p.13). Plaintiff further avers that on "November 23, 2004, while in [the] North-1 Protective Custody Unit, Plaintiff was ordered by a[n] officer to move in[to] cell 208." (Doc. 37-2, p.13). As a result of the gaps around a door across the hall and a malfunctioning heating system, it became "excessively cold" in Plaintiff's cell. (Doc. 37-2, p.13). On December 14th and 15th 2004, Plaintiff submitted grievances to Defendant Reardon and Spiller, respectively, complaining about the cold, but received no response. (Doc. 37-2, p. 14).

On February 4, 2005, Plaintiff was eligible to go to the prison commissary, but he avers that Defendants Smith-Vasquez, McDaniel, and Waller would not allow him to go that day. (Doc, 37-2, p.15). Plaintiff avers that Defendant Smith-Vasquez told him that Defendants McDaniel and Waller tod her not to allow Plaintiff to go to the commissary. (Doc. 37-2, p. 16). On February 9, 2005, Plaintiff submitted a grievance to Defendant Reardon and a letter to Defendant Martin regarding being deprived of his commissary privileges. (Doc. 37-2, p. 16). Neither Defendant Reardon or Defendant Martin responded. (Doc. 37-2, p. 16). Plaintiff avers that on May 5, 2005, Defendant Waller, along with "Officer Cowan," did not allow him to go

to commissary despite his eligibility to go, but on May 9, 2005 another officer allowed Plaintiff to go to commissary. (Doc. 37-2, p.16).

On April 25, 2005, while Plaintiff was handcuffed, an officer identified only as "John Doe," squeezed and twisted Plaintiff's wrist and thumb causing Plaintiff "extreme pain." (Doc. 37-2, p. 16.) Plaintiff avers he submitted a grievance to Defendant Reardon regarding the incident. (Doc. 37-2. P.16. Again, Reardon did not respond. (Doc. 37-2, p. 16). (Doc. 37-2, p. 17). On May 14, 2005, Plaintiff was issued what he avers was a "false" disciplinary report. The same day, "Officer Maue" entered Plaintiff's cell, handcuffed him, "slammed Plaintiff into the wall," and twisted the cuffs, Plaintiff's wrist and thumb. (Doc. 37-2, p. 17). Plaintiff avers that on June 3, 2005, he submitted grievances to Defendant Summers regarding the incidents involving "Officer John Doe" and "Officer Maue." (Doc. 37-2, p. 18). Defendant Summers did not respond to the grievances. (Doc. 37-2, p. 18).

On May 26, 2005, Plaintiff received part of his personal property consisting of a fan and eyeglasses. (Doc. 37-2, p.17). Plaintiff noticed damage to his fan and eye glasses. and avers that his television and cassette tapes were in Defendant Hoffman's possession. (Doc. 37-2, p. 17). Plaintiff filed a grievance regarding the property and Defendant Summers responded to that grievance. (Doc. 37-2, p. 18). Upon being transferred to another facility in the summer of 2005, he noticed damage to his television and cassette tapes. (Doc. 37-2, p. 19).

On June 21, 2005, Plaintiff sent three grievances regarding his claims of staff

misconduct and the cold conditions the previous year directly to the Administrative review board. (Doc. 37-2, p. 18). The board did not process Plaintiff's grievances. (Doc. 37-2, p. 18). On July 2, 2005, Plaintiff submitted two grievances to Defendant Summers regarding Defendant Reardon's refusal to respond to Plaintiff's grievances and the commissary deprivation. (Doc. 37-2, p. 18). Defendant Summers found the grievances were not timely filed. (Doc. 37-2, p. 18).

Plaintiff's fellow prisoners also submitted affidavits regarding certain elements of his retaliation/conspiracy claims. David Williams avers that on May 14, 2005, Plaintiff was removed from his cell, which was next door to Williams' cell. (Doc. 37-2, p. 9). Williams states that following Plaintiff's removal from the cell, Defendants Smith-Vasquez, Vasquez and an unidentified corrections officer entered Plaintiff's cell and that moments later he heard a "loud sound." (Doc. 37-2, p. 9). The "loud sound" was quickly followed by the word "oops" and then laughter. (Doc. 37-2, p. 9). He claims to have also heard "what sounded like a fan" hitting the floor in Plaintiff's cell followed by what sounded like cassettes and cassette cases hitting the floor and being repeatedly stepped on. (Doc. 37-2, p. 9).

Affiant Deon Davis avers that on February 4, 2005 he heard Defendants Vasquez, Waller and McDaniel deny Plaintiff commissary privileges. (Doc. 37-2, p. 10). He also avers that on May 5, 2005 he heard Plaintiff complain to Defendant Waller and "Officer Cowan," regarding the denial of his commissary privileges and that Plaintiff was not allowed to go to commissary that day. (Doc. 37-2, p. 10).

Finally, Davis states that on May 14, 2005, right after Plaintiff was taken to segregation, Defendant Smith-Vasquez and other staff were in Plaintiff's cell and he hard "noises as if [Plaintiff's] property was being damaged." (Doc. 37-2, p. 11).

All of the Defendants but Defendant Hoffman aver that they have no recollection or knowledge of Plaintiff's past lawsuits. (Doc. 31-2, pp. 11, 12, 19, 20, 22, 23, 29, 30, & 36). All Defendants also aver that they have no knowledge of any conspiracies or acts of retaliation against Plaintiff. (Doc. 31-2, pp. 10, 11, 12, 19, 20, 22, 23, 29, 30, & 36).

Defendant McDaniel avers that Plaintiff was categorized as a "C-grade" prisoner, which resulted in his commissary visits being restricted to once per month. (Doc. 31-2, p. 12). Defendant McDaniel further avers that he does not know why Plaintiff did not go to the commissary in February 2005. (Doc. 31-2, p. 13). Plaintiff does not deny he was "C-grade," nor does he provide any testimony regarding why he did not go to commissary at all during the month of February.

Defendant Martin avers he has no knowledge of any correspondence from Plaintiff in 2005. (Doc. 37-2, p. 11). Defendant Waller avers he has no recollection of Plaintiff. (Doc. 37-2, p. 36). Defendant Hoffman avers he has no knowledge of any damage being intentionally inflicted upon Plaintiff's property and denies doing it himself. (Doc. 31-2, p. 10). He also denies conspiring against or retaliating against Plaintiff for any reason. (Doc. 31-2, p. 10). Defendant Jason Vasquez also denies any knowledge of intentional damage to Plaintiff's personal property. (Doc. 31-2, p.

29).

Defendant Smith-Vasquez recalls Plaintiff, but avers she has no recollection of him ever complaining when he was assigned to her gallery at Menard. (Doc. 31-2, p. 20). Defendant avers that she has no knowledge of any instances in which Plaintiff was denied access to the commissary despite his eligibility. (Doc. 31-2, p. 20). She also denies any knowledge of Plaintiff's property being intentionally damaged. (Doc. 31-2, p. 20).

Defendant Reardon avers he has no recollection of Plaintiff whatsoever. (Doc. 31-2, p. 19). That said, Defendant Reardon does not deny any of Plaintiff's allegations regarding a lack of responsiveness to grievances. Defendant Summers admits receiving grievances from Plaintiff on July 7, 2005 concerning activity taking place in December 2004, February 2005, and May 2005, but states she denied the grievances in accordance with the Administrative Code because they concerned incidents more than 60 days old. (Doc. 31-2, p. 23). Defendant Summers neither admits or denies that she received grievances from Plaintiff in June 2005 as he avers.

Based on the record discussed above and in the previous section of this Order regarding Plaintiff's 8th Amendment claim, the Court finds that Plaintiff fails to make a showing supporting an essential element of his claim. Specifically, Plaintiff does not show that his 1998 lawsuit and/or his filing of grievances was a "motivating factor" for Defendant's actions.

Plaintiff's affidavit merely sets forth the facts behind the four actions that Plaintiff claims Defendants took. The closest the Affidavit comes to showing a connection between Defendant's claimed actions and a retaliatory motive is in paragraph 2, wherein Plaintiff avers that "[o]n August 20, 2004, while at Menard Correctional Center, Officer Rachel Smith stated to Plaintiff that a lot of staff dislike you because of a lawsuit you filed against Menard." (Doc. 37-2, p. 13). That statement precedes the first alleged retaliatory action by nearly four months. During that entire period, Plaintiff was housed in the Protective Custody Unit under the authority and control of the very Defendants he accuses of retaliating against him. Yet, there was not a single incident of retaliation by the Defendants during that time reflected in the record. Moreover, Smith-Vasquez's statement does not identify what staff purportedly disliked Plaintiff out of the hundreds of personnel assigned to Menard, including Defendant Smith-Vasquez herself. In fact, the most reasonable inference from the statement is that Smith-Vasquez was not including herself among those members of the staff that disliked Plaintiff.

While providing further support for the contention that the Defendants took some of the actions Plaintiff alleges, none of the other evidentiary materials Plaintiff submitted in support of his Response to Defendant's Motion for Summary makes the connection between the conduct and the alleged retaliatory intent. It is only in the Complaint that such assertions are made. When the claims in Count 8 are broken down into its constituent parts, the lack of evidence supporting a retaliatory motive

becomes even more plain.

**1. Lack of Heat:** The Complaint accuses Defendants Smith-Vasquez, Waller, McDaniel, Reardon and Spiller of refusing to provide heat to Plaintiff's gallery in retaliation for the lawsuit and grievances he filed regarding conditions of confinement. In the first place, the record does not show that Plaintiff filed any grievances before the heat allegedly stopped working. Thus, the evidence cannot support the contention that these Defendants' actions were motivated by a desire to retaliate for Plaintiff's grievances. Secondly, the record reflects that Defendants Smith Vasquez, Waller and McDaniel each submitted work orders in order to rectify the heating problem, which undermines Plaintiff's contention they were retaliating against him at all. Third, Plaintiff admitted at the hearing that he had no evidence to support the contention that these Defendants deliberately shut off the heating system.

As already stated, the fact that none of these Defendants were parties to Plaintiff's 1998 lawsuit combined with length of time between the suit and the time of the allegedly retaliatory conduct undercuts the inference that the alleged deprivation of heat was for retaliatory purposes. Finally, there is no evidence that any of these Defendants were responsible for placing Plaintiff across the hall from the drafty door. Plaintiff's testimony in his affidavit is that "[o]n November 23, 2004, while in the North-1 Protective Custody Unit, Plaintiff was ordered by a[n] officer to move in cell 208." (Doc. 37-2, p. 13). That averment clearly reflects that it was not

any of the Defendants in the case at bar that ordered Plaintiff to move because, presumably, Plaintiff would have identified the "officer" if that was the case. In any event, there is no evidence that the Defendants have authority to decide cell assignments. Thus, there being no genuine issue of material fact, the Court rejects Plaintiff's claim that Defendants retaliated against him by subjecting him to cold conditions.

**2. Denial of Commissary Privileges:** Plaintiff alleges that Defendants Smith Vasquez, McDaniel, Waller, and "Officer Cowan" denied him access to the commissary in retaliation for the 1998 lawsuit and his grievances. The record demonstrates that Plaintiff did not go to commissary in February 2005. Although Plaintiff claims that Defendant Waller and Officer Cowan also prevented him from going on May 5, 2005, Plaintiff's affidavit concedes he went to commissary on May 9, 2005. He also does not contest he was categorized as "C-Grade" and that such status only allowed him one trip to the commissary per month. There is no evidence or even a claim in the record that a "C-grade" inmate may choose which day of the month he goes to commissary. Plaintiff received his one trip for May. Because the record reflects that Defendants did not deny Plaintiff a privilege to which he was entitled in May 2005, the Court finds that this claim must fail. Even if that was not the case, the Court would find the claim fails for the same reasons the February commissary claim fails.

Regarding the February 4, 2005 commissary denial and the 1998 lawsuit,

again, none of these Defendants were parties to the 1998 lawsuit. The record does not show any other connection between these Defendants and that lawsuit. Smith Vasquez's statement that some of the staff did not like Plaintiff because of the lawsuit is insufficient to show a connection because it preceded the alleged retaliation by nearly six months and does not identify any one of these Defendants among the hundreds of staff at Menard Correctional Center. The parties stipulated to a dismissal of the 1998 lawsuit nearly three years prior to the February 4, 2005 commissary denial. There is no other evidence in the record from which an inference can be drawn that these Defendants were motivated by that lawsuit to retaliate against Plaintiff. Thus, Plaintiff's claim that the 1998 lawsuit was a motivating factor for these Defendants to deny commissary privileges must fail.

The record is also devoid of any evidence connecting Plaintiff's previous grievances to the denial of access to the commissary other than the fact that the denial occurred after those grievances. The only grievances preceding the February 4, 2005 denial of commissary was Plaintiff's cold conditions grievances and the grievance alleging "Officer White" hit Plaintiff with a juice. Plaintiff did not formally submit any grievances to these Defendants. Those grievances went to Defendants Spiller and Reardon, who are not implicated in the denial of commissary privileges. The assault grievance was against "Officer White" rather than one or more of these Defendants. The Defendants identified as perpetrating the denial of commissary privileges are the same Defendants that referred Plaintiff's complaints of the cold to

the maintenance personnel. That fact undermines Plaintiff's claim that these Defendants retaliated against him because he filed a grievance regarding the cold conditions. In sum, because Plaintiff fails to sufficiently show a connection between the denial of commissary privileges in February 2005 and the 1998 lawsuit and grievances he filed prior to the denial, the Court finds that this claim fails.

**3. Damage to Personal Property:** The next claim that makes up Count 8 is Plaintiff's allegations that Defendants Smith Vasquez, Jason Vasquez, and Hoffman damaged Plaintiff's personal property without compensation. At the hearing on Defendant's Motion for Summary Judgment, Plaintiff conceded that he was compensated for the damage to his property. In any event, he again fails to show sufficient evidence showing that Defendants' conduct was motivated by Plaintiff's protected conduct. Absent additional evidence, the lawsuit is too distant in time, even taking into consideration that Defendant Hoffman was a named defendant in that lawsuit. He was dismissed in August 2000, nearly five years before the alleged damage took place.

Plaintiff also fails to show that his grievances preceding the damage to the property provided a retaliatory motive for these Defendants. The grievances have no connection to the property damage except that they precede the damage on the calendar. The damage to the property is averred to have occurred on May 14, 2005. Prior to that date, Plaintiff filed grievances on December 14, 2009, December 28, 2004, February 9, 2005, and April 25, 2005. The only common thread between these

grievances other than their order on the calendar is that Defendant Waller was specifically cited for both the February and May denials of commissary privileges. None of the Defendants alleged to have damaged Plaintiff's personal property were named in any of these prior grievances according to Plaintiff's affidavit. Plaintiff's attempts to connect the damage of his personal property to the grievances he filed prior to the date of the damage is purely speculative. Thus, Defendants are entitled to summary judgment on Plaintiff's claim that defendants Smith-Vasquez, Vasquez and Hoffman retaliated against him by damaging his personal property .

**4. Refusal to Process Grievances:** The final component of Count 8 is Plaintiff's allegations that Defendants Summers, Reardon, and Martin refused to process Plaintiff's grievances in retaliation for the 1998 lawsuit and Plaintiff's filing of grievances. Regardless of the truth of the allegation that these Defendants refused to process Plaintiff's grievances, the record contains insufficient evidence connecting the refusal to the past protected conduct for Plaintiff to avoid summary judgment.

Plaintiff claims he submitted a letter to Defendant Martin in February 2005 regarding being deprived commissary in February and that Martin did not respond. (Doc. 37-2, p.16). Defendant Martin served as Assistant Warden of Operations at the time. (Doc. 37-2, p. 16). The mere fact that Martin did not respond to Plaintiff's letter is insufficient to establish he did so to retaliate against Plaintiff. In the first place, he was not a counselor or a grievance officer and not required by the grievance process to respond in person to Plaintiff's letter. *See* **20 Ill. Administrative Code**

**§§ 504.800-504.870**.  Plaintiff does not cite any authority for the proposition that an assistant warden is required to respond directly to an inmate that writes him. More importantly, there is simply no causal connection in the record between Martin's lack of response and Plaintiff's prior lawsuit or his prior grievances.  Martin avers he has he has no recollection of the grievances or the lawsuit and there is no evidence in the record to dispute that testimony.   There is no evidence in the record that Martin was even employed at Menard during Plaintiff's 1998 lawsuit nor is there any evidence suggesting he would have any knowledge of Plaintiff's grievances that preceded Plaintiff's letter to him.  His position in the prison was not part of the grievance chain.  Thus, this claim against Martin fails.

Regarding Defendants Summers and Reardon, Plaintiff also falls short of the mark.  As with the other Defendants, the 1998 lawsuit  is simply too remote in time for any inference to be drawn that it was connected to Reardon's and Summers' alleged retaliatory conduct.   That is especially true given that they were not parties to that lawsuit.  Moreover, Defendant Reardon was not employed at Menard until 1999, one year after Plaintiff filed the 1998 suit.  Defendant Summers was not employed at Menard until November 2004, years after the 1998 lawsuit was dismissed.   Further, she was not employed with the Illinois Department of Corrections until 2001, three years after the 1998 suit was filed.  There is no other evidence in the record that links the 1998 lawsuit to Reardon's or Summers's lack of responsiveness to Plaintiff's grievances.  Thus, the claim that these Defendants retaliated against Plaintiff for the 1998 lawsuit fails.

Plaintiff avers he submitted grievances to Reardon as follows: (1) December 14, 2009 for cold conditions; (2) December 28, 2004 alleging "Officer White" hit Plaintiff in the stomach with a juice carton; (3) February 9, 2005 for being denied commissary on February 5, 2005; and (4) April 25, 2005 for an alleged assault by an unidentified officer on April 24, 2005. (Doc. 37-2, pp. 13-19). He avers he submitted grievances to Defendant Summers as follows: (1) June 3, 2005 for (a) damage to Plaintiff's personal property; (b) the alleged assault in April; and (c) an alleged assault by "Officer Maue" in May 2005; and (2) July 2, 2005 for (a) counselor Reardon's refusal to respond to Plaintiff's grievances to him; and (b) the denial of commissary privileges by "Officer Cowan" and Defendant Waller in May 2005. (Doc. 37-2, pp. 13-19). Plaintiff also testified in his deposition that Defendant Reardon told Plaintiff that "when he was an officer. . . he disliked me." (Doc. 31-2, p. 44).

To begin with, there is no requirement in the Illinois Administrative Code that prison counselors provide an inmate with a formal/written response. ***Supra***. If Plaintiff was unsatisfied with the level of responsiveness he received from Defendants Reardon and Summers, the Administrative Code allows him to take that issue in writing to the Grievance Officer. ***Supra***. On that basis alone the Court finds a lack of retaliatory conduct here. Defendants lack of direct response cannot be retaliation in this context if they are not required to take the action in the first place. Regardless, however, the record does not support Plaintiff's claims.

Regarding the December 14, 2008 grievance to Reardon, there is no evidence

in the record of a prior grievance pursuant to which Reardon could retaliate against Plaintiff. Thus, that claim fails. As for the second grievance, Plaintiff's deposition testimony reflects that the incident was investigated and that Plaintiff was placed in segregation pending investigation. (Doc. 31-2, p. 43). That suggests Plaintiff's accusation was taken seriously and is a sufficient response, especially given that the Administrative Code does not require that a counselor issue a written response. Regardless, Plaintiff fails to show a plausible connection between Reardon's purported refusal to formally address this grievance and the prior grievance regarding the cold conditions.

In his deposition Plaintiff asserted that Reardon told him that he did not like Plaintiff. However, there is nothing tying that dislike to Plaintiff's protected conduct. In fact, Plaintiff's testimony was that Reardon did not like him when Reardon was an officer (Doc. 31-2, p. 44), which was years before the incidents at issue in this case. (Doc. 31-2, p. 19). In any event, if Reardon's reason for not formally responding to Plaintiff's grievances was merely that Reardon "disliked" Plaintiff, no constitutional violation occurred. The same deficiencies apply to the next two grievances. Other than the fact that they followed Plaintiff's other grievances, there is simply nothing in the record that provides a connection between these refusals to address grievances and previous grievances Plaintiff filed. Thus, the Court rejects Plaintiff's claim that genuine issues of material fact exist on this issue.

The evidence supporting Plaintiff's allegations against Defendant Summers is

even more tenuous. Plaintiff submitted the first grievances to her on June 3, 2005 and the next set in July 2005. Regarding those submitted in July, Defendant Summers avers that she rejected them because they were for incidents occurring more than 60 days prior to the filing of the grievance. The grievance forms attached to her Affidavit are consistent with that testimony and Plaintiff's affidavit reflects that Summers' calculation of the time period was correct. Thus, the Court concludes Summers acted properly regarding the July 2005 grievances. As for the June 2005 grievances, there is no evidence in the record tying Summers' purported refusal to respond to those grievances to a retaliatory motive. Moreover, in his affidavit, Plaintiff states that Summers did respond to his June complaint regarding his personal property. (Doc,. 37-2, p. 16). Thus, the Court finds that Plaintiff's claims that Defendant Summers retaliated against him fail.

### C.    **Count 9: Conspiracy**

In Count 9, Plaintiff alleges that all of the Defendants conspired to subject Plaintiff to (a) excessive coldness; (b) physical abuse; (c) deprivation of commissary; (d) deprivation of procedural due process; (e) destruction of property; and (f) deprivation of the right to petition the court for redress of grievances. (Doc. 9). Essentially, these claims correspond with the grievances Plaintiff avers he filed in 2004-2005. ***Supra***.

To succeed on a basic civil conspiracy claim, Plaintiff must establish (1) an agreement between two or more persons to inflict a wrong against or injury upon

another, and an overt act that results in damage.  **Scherer v. Balkima, 840 F.2d 437, 441 (7th Cir. 1988)**.  To succeed on his civil conspiracy to deny constitutional rights claim, Plaintiff must demonstrate that (1) the defendants had an express or implied agreement to deprive plaintiff of his constitutional rights, and (2) he was deprived of his constitutional rights by defendants' overt actions in furtherance of the agreement.  **Williams v. Seniff, 342 F.3d 774, 782 (7th Cir. 2003); Scherer v. Balkema, 840 F.2d 437, 442 (7th Cir. 1988)**.  The Seventh Circuit has further determined that if the agreement was not overt, there must be evidence "suggesting a 'meeting of the minds . . . . the alleged acts must be sufficient to raise the inference of mutual understanding (i.e. the acts performed by the members of the conspiracy are unlikely to have been undertaken without an agreement.") **Amundsen v. Chicago Park Dist., 218 F.3d 712, 718 (7th Cir. 2000) (quoting Kunick v. Racine County, Wisconsin, 946 F.2d 1574, 1580 (7th Cir. 1991)**.  In fact, a conspiracy claim cannot survive summary judgment if the allegations are "vague and conclusionary and include no overt acts reasonably related to the promotion of the alleged conspiracy." **Id**.

Each Defendant avers that he or she has no knowledge of any conspiracy against Plaintiff.  Except for the personal property claim and the commissary claim, the record, as extensively discussed herein, does not reflect any evidence of an agreement or meeting of the minds among some or all of the Defendants to do any of the things Plaintiff alleges.  Every one of the other actions Plaintiff avers

Defendants took against him were carried out by one of the Defendants or unserved coconspirators, individually. There is no evidence that links those individual actions to some greater scheme or plan.

**1. Cold Conditions:** There is no evidence in the record reflecting that Defendants conspired to subject Plaintiff to cold conditions. First, there is no evidence of an agreement. Second, there is no evidence of an overt act on the part of the Defendants. Plaintiff conceded he had no evidence that Defendants acted to create the cold conditions in his cell. There is also no evidence that any one of these Defendants effectuated Plaintiff's transfer to cell 208, thus subjecting him to cold conditions that existed there. More importantly, Defendants Smith-Vasquez, McDaniel, and Waller each signed off on work orders seeking to repair the heating systems for Plaintiff's cell's gallery. In the absence of other evidence supporting Plaintiff's claim, that evidence effectively undermines Plaintiff's theory of a conspiracy to subject him to cold conditions. Thus, those conspiracy claims must fail.

**2. Physical Abuse:** There are three alleged instances of physical abuse that are supported by evidence in the record. First, Plaintiff avers that on December 28, 2004 "Officer White" hit Plaintiff in the stomach with a carton of juice. (Doc. 37-2, p. 15). Second, Plaintiff avers that on April 24, 2005, an officer identified as "John Doe" "squeezed and twisted Plaintiff's wrist and thumb causing extreme pain." (Doc. 37-2, p. 16). Third, on May 14, 2005, "Officer Maue" slammed Plaintiff into the wall and squeezed and twisted handcuffs around Plaintiff's wrists and squeezed and

twisted Plaintiff's thumb causing "extreme pain." (Doc. 37-2, p. 17). In the first place, none of these individuals are defendants in this case because they were not served a copy of the Complaint, which is why the Court did not consider this claim as part of the retaliation claim despite Plaintiff's allegations. In the case of conspiracy, however, their conduct can be considered if it can be inferred the conduct was an overt act in furtherance of a greater conspiracy involving those Defendants that were served.

There is no evidence these acts of physical abuse were in furtherance of an agreement to deny Plaintiff his rights or otherwise inflict damage upon him. Each instance appears isolated from the next and involves only one person. Plaintiff's averments are the only evidence in the record suggesting these events even took place. Because his evidence does not create any inference of an agreement among two or more persons, there is no genuine issue of material fact concerning Plaintiff's conspiracy claim for physical abuse.

**3. Damage to Personal Property:** Plaintiff avers that Defendant Hoffman had possession of his property for a time and that when it was returned, it was damaged. That evidence fails to establish an agreement among two or more people. There is no other evidence in the record tending to show Hoffman conspired with anyone to damage Plaintiff's property, let alone actually damaged it.

The remainder of the evidence supporting the property claim comes from two inmate affidavits. Those two inmates aver that they witnessed Defendants Smith-

Vasquez, Jason Vasquez, and an unidentified officer enter Plaintiff's cell after he was removed and then heard noises consistent with his property being damaged followed by laughter. While this evidence arguably creates a genuine issue of material fact on the issue of an agreement among these Defendants to damage Plaintiff's personal property, Plaintiff conceded at the hearing on Defendants' Motion for Summary Judgment that he was compensated for the damage to his personal property. This particular part of his claim does not involve the deprivation of a constitutional right. Thus, actual damages are an essential element of the claim. Because Plaintiff admitted he was compensated for his personal property, this claim fails.

**4. Deprivation of Procedural Due Process:** The only occurrences in the record to which this claim could apply is to the lack of responsiveness to Plaintiff's grievances. The Court has already discussed these claims in great detail in previous sections of this Order. Suffice it to say, that the evidence is insufficient to demonstrate either an agreement among two more Defendants to deny Plaintiff this constitutional right or an overt act tending to deny Plaintiff same. In regards to the latter element, the record reflects that Plaintiff failed to abide by the process provided to him by submitting written grievances to the Grievance Officer when he did not receive satisfactory responsiveness from Defendants. Thus, this conspiracy claim fails.

**5. Denial of Commissary Privileges:** For the claim that Defendants conspired to deny him commissary privileges, Plaintiff avers that despite Plaintiff

being eligible, "Officer Smith-Vasquez, Sergeant McDaniel, and Lieutenant Waller would not allow Plaintiff to go" to the commissary on February 4, 2005. (Doc. 37-2, p. 15). Next Plaintiff states that "Officer Smith-Vasquez told Plaintiff that Sgt. McDaniel and Lt. Waller told her not to let Plaintiff go to the commissary." (Doc. 37-2, p. 16). Plaintiff also avers that Defendant Waller and "Officer Cowan" denied him permission to go to commissary on May 5, 2005, but admits he went on May 9, 2005. (Doc. 37-2, p. 16).

Defendant McDaniel avers he does not know why Plaintiff did not go to the commissary in February 2005 (Doc. 31-2, p. 12-13). Defendant Smith-Vasquez avers she has no knowledge of any instances where Plaintiff was denied access to the commissary despite being eligible. (Doc. 31-2, p. 20). Defendant Waller does not mention Plaintiff's commissary claim in his affidavit. (Doc. 31-2, p. 36). Combined with the facts averred in Plaintiff's affidavit, which the Court must accept as true for purposes of this Motion, these facts establish a genuine issue of material fact of an agreement among two or more of these Defendants to deny Plaintiff commissary access on one day in February and one day in May. However, Plaintiff must still produce evidence indicating damages.

Being on "C-grade" status, Plaintiff was permitted to go to commissary once per month. (Doc. 31-2, p. 12). There is nothing in the record indicating Plaintiff could only go to commissary on one particular day or one particular week each month and that if he did not, he forfeited the privilege for that month. In fact, the

record supports the opposite conclusion given Plaintiff's trip to the commissary on May 9, 2005 after being denied permission on May 5, 2005, (Doc. 37-2, p. 16), and the dates Plaintiff's commissary record indicates he went to commissary in 2005. (Doc. 31-2, pp. 12-13 & 17-18). Those dates varied between the first and second week of each month and also varied as to the day of the week. The record lacks any evidence explaining why Plaintiff did not go to commissary on some other day in February and does not reflect that Defendants denied him that right on any day but February 4, 2005. The record affirmatively shows that Plaintiff was not denied the right to go to commissary in May, and that claim fails for that reason alone.

Although, there is a genuine issue of material fact concerning an agreement among Defendants McDaniel, Waller and Smith-Vasquez to deny Plaintiff commissary on February 4, 2005, Plaintiff does not show that he was prevented from going at some other time in February, which is all his "C-grade" status allowed him. As a result, Plaintiff fails to support his burden of demonstrating Defendants conspired to deny him any privilege to which he was entitled, let alone shows any actual damages from the denial of commissary privileges on February 4, 2005. Thus, the Court finds that there is no genuine issue of material fact regarding Plaintiff's claim of a conspiracy to deny him commissary privileges.

**6. Deprivation of the right to petition the court for redress of grievances**: The only conduct supported by the record that might demonstrate a deprivation of Plaintiff's right to petition the court for redress of grievances is the lack of

responsiveness to Plaintiff's grievances. The Court finds that summary judgment in favor of Defendants is appropriate here for the same reasons the Court found that Plaintiff's claim of a conspiracy to deny him "procedural due process " failed. Thus, the Court finds that summary judgment in favor of Defendants for Plaintiff's conspiracy claims is appropriate.

## V. <u>Conclusion</u>

In sum, the Court concludes that Plaintiff has (a) failed to exhaust the administrative grievance process; (b) failed to effectuate service of process as to "Officer John Doe," "Officer Maue," "Officer White," and "Officer Cowan"; and (c) failed to make a sufficient showing of essential elements of each of his claims. Although a failure to exhaust the administrative grievance procedure typically results in a dismissal, without prejudice, the Court believes that summary judgment is appropriate here. First, the record, which the parties took the time to bring before the Court, supports entry of summary judgment. Second, the statute of limitations on these claims and the time limits for Plaintiff to administratively exhaust these claims long ago expired. Finally, the record supports the conclusion that the failure to exhaust was primarily Plaintiff's fault.

Accordingly, the Court finds that there are no genuine issues of material fact and **GRANTS** Defendants' Motion for Summary Judgment. Plaintiff's claims, to the extent they are applicable to those persons identified as "John Doe," "Officer Maue," "Officer Cowan," and "Officer White," are **DISMISSED, WITHOUT PREJUDICE,** for

Plaintiff's failure to exhaust his administrative procedures and for failure to serve those persons within 120 days pursuant to Federal Rule of Civil Procedure 4(m). The Court **DENIES** all other pending motions as **MOOT**.

**IT IS SO ORDERED.**

Signed this 8th day of September, 2009.


/s/        *David R Herndon*

**Chief Judge**
**United States District Court**